Jan. 1841.

The Western
Reserve
Bank
v.
Potter.

---

## THE WESTERN RESERVE BANK vs. POTTER.

Where the whole interest of a mortgagee in a mortgage is assigned with a guarantee, and the mortgagee dies before a foreclosure is commenced, it is not necessary for the assignee to make the personal representatives of the mortgagee parties defendant, in a foreclosure of the mortgage, if he does not also proceed upon the guarantee or personal covenant of the mortgagee.

Generally, the proper parties to a suit for the foreclosure of a mortgage, are the mortgagor and mortgagee, and those who have acquired rights and interests under them subsequent to the mortgage.

A mortgagor defendant cannot insist that a mortgagee, under a mortgage elder than the mortgagor's title, shall be made a party defendant in a suit to foreclose a mortgage for the purchase money, unless in his answer he makes some claim in relation to such prior incumbrance, to show that it should be taken into consideration in the decree.

A chose in action, valid in its inception, may be sold at a discount less than its face, and beyond the legal rate of interest without subjecting the purchaser to the imputation of usury.

When a usurious loan has been made, any transfer of even valid paper to the lender in such usurious loan, as security for the payment thereof, is void in the hands of such usurious assignee, and he cannot enforce the collection thereof, even against the maker of such valid paper.

In an assignment of assignable paper for less than its face, the question of fact to be considered is, whether it is an assignment as a bona fide sale, or a device to cover an usurious loan; in other words, whether it is a sale or a loan.

A guarantee of payment of the full amount mentioned in a bond, assigned for less than its face, is not of itself conclusive evidence that the assignment was made in pursuance of an usurious agreement, particularly in a suit by the assignee against the obligor upon the bond.

An assignment of a mortgage for less than its face, will enable the assignee to recover the whole amount secured by the mortgage of the mortgagor, even though the assignment was accompanied by a guarantee of payment of the full amount due and to grow due upon the mortgage—and in a suit by the assignee against the mortgagor to foreclose the mortgage, the mortgagor cannot set up usury in the transfer from the mortgagee to the assignee.

The object of the restraining law was to prevent unauthorised banking; and as to foreign corporations, it was intended to prevent their coming into this state and keeping an office for doing the business of banking when not authorised by our laws.

A foreign banking corporation coming into this state, by their agents, to secure a doubtful debt, and while here doing a single act of drawing a bill of exchange, and paying out their own circulating notes, in pursuance of their leading object, (not having an office or doing general business within this state) do not, by such acts, violate the restraining law of this state.

THIS bill is filed specifically to foreclose a mortgage executed by the defendant to *Hiram Pratt*, and by *Pratt* assigned to the complainants. But the answer and proofs embrace other matters and show substantially the following facts: Benjamin Rathbun of Buffalo, previous to his failure, had put in circulation a large amount of commercial paper with forged endorsements. Among them were two drafts, one drawn upon H. Janes, and excepted by him, for $4,000, and one drawn upon J. Gravier, not excepted by him, for $4,000. These two drafts the complainants held. Rathbun failed in August, 1836, and made an assignment. He was insolvent, and the drawees were insolvent, and the endorsements were forgeries; and the value of these drafts in the complainants' hands, after Rathbun's failure, depended upon the construction of Rathbun's assignment, and

the value of the assigned property, applicable to their payment. In February, 1837, the value of these drafts were estimated at from forty to sixty cents on the dollar. The complainants are a moneyed corporation in Ohio, and in the month of February, the president of this corporation was in Buffalo, and informed Mr Pratt that he could purchase bonds and mortgages with the above drafts, by placing a considerable amount of cash with them, and inquired about certain securities which were proposed. Hiram Pratt finally made an inchoate arrangement with the president in relation thereto, by which Pratt was to assign to the complainants the mortgage of the defendant, amounting to $6,400; the mortgage of Stryker and Smith amounting to about $18,000; and the mortgage of E. Jessup amounting to about $16,000—or in all, with interest, amounting to something more than $41,000. All of these mortgages were to be guarantied by Pratt, and some of them by the guarantee of others. The complainants were to pay therefor the two above drafts, and the balance in cash; and Pratt was to allow the usual premium upon such New-York funds as he should receive from the complainants. The president said he could not close the arrangement until he went home to Ohio to consult the directors of the bank; and if they approved of it, (as he had no doubt they would,) he would send their cashier down to complete the arrangement. Soon afterwards the cashier of the complainants came to Buffalo, and on the 17th February, 1837, the arrangement was closed. Pratt assigned the mortgages with the required guarantees, and received the funds, as before agreed. The following is a brief statement of the property assigned to the complainants :

Stryker and Smith's bond and mortgage,
 with interest,       $18,799 00

H. B. Potter's  " " "  6,400 00

E. J. Jessup's  " " " 16,459 10

             —————

            $41,658 10

The Western
Reserve
Bank
v
Potter.

for which Pratt received

The two above drafts, with interest, pro-
 test, and postage,      $8,228 35

In circulating notes of the Western Re-
 serve Bank,       5,000 00

In draft on New-York,    28,148 27

Premium on last draft, 1 per cent.  281 48

            —————

           $41,658 10

Five thousand dollars of the money paid to Pratt, was paid to him in Buffalo, in circulating notes of the Western Reserve Bank, with the understanding that Pratt should put them in circulation; and the draft upon New-York was drawn by the cashier of the Western Reserve Bank, in Buffalo, where the transaction was completed. Before the commencement of the suit, Pratt died intestate, leaving a widow and three infant children; and letters of administration were taken out upon his estate. Before the hearing, Pratt's administrators gave the defendant notice not to pay this mortgage to the complainants, on the ground that the transfer to the complainants was void for usury; and that they intended to institute proceedings to recover the mortgage from the complainants. The defendant set up this in his answer, and also that the mortgaged premises were conveyed to him by Pratt, with a covenant of seizin, and

against incumbrances; and that there was a prior incumbrance executed by Pratt to one Potwin, upon which some $1,200 was yet unpaid; and insisting that Potwin and the administrators of Pratt should be made parties defendant. Pratt's estate is embarrassed, probably insolvent. Potter is the only defendant. The cause is brought to a hearing upon pleadings and proofs.

*S. E. Sill*, for complainants.

*E. G. Spaulding*, for defendant.

The Vice Chancellor. There are many points made in this cause; and the importance of the case renders it necessary and proper that they should be examined *seriatim*.

A point was made on the argument, that the charter of the complainants was not sufficiently proved; and that if proved, it did not authorise the complainants to invest their funds in the purchase of bonds and mortgages. In the written points furnished to the court, I do not find this point presented, and, moreover, I do not find among the papers the copies of the complainants' charter and its renewal, which were read on the hearing. I shall therefore assume, particularly as I do not find the point made in the papers now before me, that it is either not considered tenable, or has been abandoned. I shall not therefore question the power of the complainants to prosecute as they have done, nor their power to invest their funds in the purchase of mortgages.

Another point made is, that the administrators of Pratt are necessary parties defendant to this suit, and this question the defendant has saved in his answer.

Jan. 1841.

The Western
Reserve
Bank
v.
Potter.

It is true that Pratt, the intestate, in the assignment of this mortgage, connected therewith a covenant of guarantee; but it is equally true that he transferred his whole interest in the mortgage to the complainants, and that the complainants do not. in this suit seek to enforce the performance of the covenant of Pratt's. Such being the case, I can see no necessity of making Pratt's administrators parties to this suit. The whole interest of Pratt in the mortgage, purports to have been conveyed to the complainants, and so far as this question is concerned, must be deemed to have been conveyed to the complainants. This court does not look at the nominal parties to a contract. They look at the real parties to it at the time the suit is commenced—the parties in actual interest—and recognize their rights in the same manner as if the contract was executed by or to them. Thus the assignee of a chose in action is recognized as the real party; and this court, rejecting all legal fictions, treats him as such, and insists that the suit shall be brought in his name. Ward vs. Van Bokhelin and others, 2 Paige, 289, is in point to show that an assignor of a mortgage who has parted with all his interest, is not a necessary party to a foreclosure of such mortgage. To the same effect is 7 Johns. Chan. Rep. 144, and many other cases, so that it is now the settled rule of this court. This objection of the defendant must therefore be disregarded.

But the defendant insists that Potwin, the prior mortgagee, is a necessary party. The defendant in his answer states that he received a conveyance of the mortgaged premises from Pratt, with covenants of seizin and against incumbrances; and far-

ther, that Pratt, prior to such conveyance, had mort-gaged the same premises to Potwin, upon which mortgage about $1,200 is now unpaid. The answer as it is framed, does not make this averment with a view of any relief as against this prior mortgage, except simply to insist that Potwin should be brought in as defendant, and the amount due upon his mortgage ascertained. It does not ask that the amount so ascertained may be deducted from the mortgage of the defendant or from his bond, by way of set off or otherwise ; or that the defendant may be at liberty to apply sufficient of the amount due from him, to pay off this prior mortgage. It merely states the fact of such prior incumbrance, with a view to bring such prior incumbrancer before the court. In the Eagle Fire Company vs. Lent and others, 6 Paige, 635, the doctrine of the Chancellor seems to be that the proper parties to a foreclosure suit, are the mortgagor and the mortgagee, and those who have acquired rights and interests under them subsequent to the mortgage.

It is sometimes proper to make a prior incumbrancer a party, with a view of ascertaining the amount of his incumbrance ; and there may be cases where it is proper to test its validity. But the common practice is not to consider such prior incumbrancer as a necessary party—the only consequence being, that if he is not a party, the sale is made subject to his prior lien. I can see no objection to this practice, and in this case no special reason under the pleadings, for bringing in Potwin as a party.

The last two points were, however, rather briefly alluded to than urged, upon the argument of this cause.

Jan. 1841.

The Western
Reserve
Bank
v.
Potter.

The prominent and important questions, and which were argued by the defendants' counsel with much earnestness and ability, are those hereafter to be considered.

It is contended that the transaction which took place between Pratt and the complainants, and which terminated in the assignment of this and other mortgages to the complainants, is usurious—that if usurious, the assignment itself is void; and the complainants claiming title to the mortgage through an illegal and void contract, has acquired no title thereto, and cannot therefore maintain this action. It will be observed that there is no usury alleged or suggested · in the bond and mortgage, as between Pratt and the defendant. This bond and mortgage, in its inception, is therefore to be deemed *bona fide* and valid. The defence set up here, then, is not strictly a technical defence of usury in the ordinary mode in which such questions are usually presented; but it is a questioning of the title of the complainants to the instruments upon which they prosecute, under the allegation that the complainants acquired title through an usurious and therefore void contract; and that by reason of the viciousness of the contract, their title is null, and they cannot therefore maintain their suit. This view of the case indeed opens the door properly to the inquiry into the question of usury, presented by the pleadings and proofs. The field opened by the question thus presented, is a broad one; and the principles of a great number of decided cases may be brought to bear upon it. The principles of the decided cases, and the opinions of eminent judges and jurists, are conflicting upon the question thus offered for decision, which is, whether the assign-

ment of a chose in action (valid in its inception) for less than the amount secured by it, with guarantee of the payment of the whole, is usurious and void; and if usurious and void, whether ths maker can set up this fact as a defence against the assignee. I say an assignment for less than the amount secured; for although nominally the amount paid by the complainants to Pratt, is equal to the amount of the assigned mortgages, yet it is apparent that the Rathbun paper which formed a part of the consideration of the assignment, was at the time worth far less than its nominal value, and far less than the amount at which it was paid and taken. There can be no doubt, if the complainants had made a direct loan to Pratt, and taken his note directly to themselves for the $41,000, and paid him therefor $33,000 in cash, and $8,000 in this Rathbun paper, but that such loan would have been usurious, and such note void for that reason.

The question of usury in the assignment of negotiable or mercantile paper for less than its face, was amply discussed in the court for the correction of errors, in the case of Cram vs. Hendricks, 7 Wendell's Reports, 569. The opinions of the judges of that court, and they were variant in their views, are marked by great fulness of research and ingenuity of reasoning. Their joint opinions refer to the whole law bearing upon the subject, and refer to and comment upon all the cases that had been previously decided.

It would probably be a useless waste of time to make a new digest of the cases so referred to, and reiterate the doctrines establiseed by them. The different opinions of the judges in that case, comprise

a treatise upon the question, to which it would be profitable for the professional inquirer to refer, both for information and satisfaction, as well in reference to authority as principle.

From the reasoning in the case thus cited, and the principles of the authorities there referred to, I extract the following principles as applicable to this case :

1. A chose in action, valid in its inception, may be sold at a discount less than its face, and beyond the legal rate of interest, without subjecting the purchaser to the imputation of usury.

2. When a usurious loan has been made, any transfer of even valid paper to the lender in such usurious loan, as security for the payment thereof, is void in the hands of such usurious assignee, and he cannot enforce the collection thereof even against the maker. This last principle is extracted from the case of Gurthen vs. The Farmers and Mechanics' Bank of Georgetown, 1 Peter's Reports, 37.

The condensation of the two rules leads us, in each case, to distinguish between the purchase of choses in action under value, and an usurious loan upon the credit of such choses in action. The distinction in each case, must be governed by the facts and intentions of the parties.

If the transaction assumes the form of a purchase, and still, from the circumstances connected with it, a court must infer that it was a device or shift to evade the statute against usury, they are bound to so construe it, and treat it accordingly.

The inquiry, then, in this case is, whether the transaction was really a sale of choses in action, or a loan of money upon the credit of such choses.

Feb. 1841.

The Western
Reserve
Bank
v.
Potter.

To constitute usury in a transaction, there must be, 1. A loan ; 2. A taking or reservation of more than legal interest ; and, 3. Such taking in pursuance of a corrupt agreement.

In this case, it is an admitted fact that there is no usury in the inception of the mortgage. If there is any, it is in the transfer. Pratt was the *bona fide* owner of this mortgage and several others. They were good in his hands, and collectable by him. The president of the corporation complainants, informed him (Pratt) that he could purchase mortgages and pay for them with Rathbun paper and cash ; and inquired of him about the value of certain mortgages. This shows, it is true, and was doubtless the fact, that the complainants were desirous of disposing of their worse than doubtful paper, with an addition of a quantity of cash, to secure the eventual payment of the whole at some future time. In other words, they wished to make a bargain which would relieve them from the loss which they anticipated, or fraud upon the Rathbun paper ; and they were willing to purchase such property and upon such terms as would ensure them the result they desired, even though the time of eventual payment was postponed. In such light, I apprehend, Pratt understood it ; and having himself property which he thought would suit the views of the complainants, he proposed to purchase on his own account—that is, he had certain mortgages which it would be convenient for him to convert into cash, even at a loss. He doubtless understood as well and probably much better than the complainants, the value of the Rathbun paper ; but understanding it, he was willing to sell his mortgages and take that paper in part payment, and abide

by the consequences. There can be no doubt of the
views which each party had in making the transac-
tion. Pratt wished to dispose of his mortgages and
obtain as much money as he could, with as little loss
as possible. The complainants wished to secure
their Rathbun paper as safely as possible, by placing
with it as little money as possible. Pratt had cer-
tain property to sell, which he wished to dispose of
and obtain the greatest amount of cash. The com-
plainants had certain bad or doubtful property which
they wished to get off from their hands, by purcha-
sing other property which they deemed better. In
speculating times this is a very common negotiation,
and is entered into according to the wants and the
exigencies, the fears and hopes, of different parties.
Pratt could have sold his mortgages for $33,000 in
cash, without the Rathbun paper, and the sale would
have been good. He could have sold them for ten
thousand acres of Illinois lands, worth probably not
over ten shillings per acre, and the sale would have
been good. Why then should the sale not be good
when, in addition to the cash, he takes the Rathbun
paper, which is worth something? The answer is
ready, that it is so if it is a sale; but it is not, if it is
only a device for a loan at an usurious interest. Such,
doubtless, in this aspect of the case, is the turning
question.

In the view that I have taken of this question af-
ter a full examination of the proofs, I have come to
the conclusion that the transaction between Pratt
and the complainants was for a sale of the mortga-
ges, and that the parties neither contemplated the
making or receiving a loan. The whole conversa-
tion and negotiation leads to this conclusion; and

though both parties were probably aware of each others' situation, and wants, and motives, yet each used those circumstances as a means to make a good bargain for themselves, and neither contemplated any thing but a favorable sale of their own property. Here, then, so far, is wanting one ingredient to usury, viz. a loan; and also another, viz. a corrupt agreement to take usury.

The only fact to repudiate this conclusion, is the legal inference to be derived from the guaranty of Pratt and others, to pay the full amount of the mortgages.

It is contended in many cases, that this circumstance alone is legally sufficient to determine the intent of the parties to make a loan. I cannot give force to such legal inference, when the circumstances of the case otherwise satisfactorily rebut any such legal presumption. As I have said before, the conversation was for a sale of the securities—the proposition was for a sale—the negotiation was for a sale—and there is nothing independent of the guaranty to lead the mind of the court to any other conclusion, than that a sale was contemplated, and not a loan. We know, in many such sales honestly made, a guarantee is asked. With the effect of this transaction upon the covenant of guaranty, I have in this cause nothing to do, as the guarantors are not made parties. But I might refer to the case of Mazuzan vs. Mead, 21 Wendell, 285, to show that the transfer and guaranty of a note in consideration of a less sum, is not, *per se*, usurious; and that the guarantor is only liable to refund upon his guaranty, such sum as he has received from the purchaser, with interest. This last case was a case of special guaranty, where

the guarantor covenanted to pay the amount of the note, which was a greater amount than that received by the guarantor upon the transfer. This is so far different from the former case of Cram vs. Hendricks, inasmuch as in the last case the note was passed by mere endorsement, and the court held that the endorsement only legally amounted to a promise to pay the money he had received. If this is to be deemed to be a sale and not a loan, the effect upon the question here presented is apparent and decisive : the complainants have a good title, and can recover by virtue of the assignment to them.

If, on the other hand, by reason of the guaranty it is to be legally inferred that this is a loan ; or, in other words, if the guaranty gives to it the character of a loan, we are then to consider the effect of the assignment, and the rights of the maker of the instrument, as against a prosecution by the assignee. There is much difference in the views of the courts upon this point, but they may probably be reasonably well reconciled by a recurrence to the facts of each case. This it will be unnecessary for me to do, as they have all been carefully collated and examined in the case of Cram vs. Hendricks. Some courts seem to have entertained the idea that a transfer of a chose in action for a less amount than the face, with an endorsement or guaranty, necessarily implies usury. These questions have mostly arisen in suits between the assignee or endorsee against the endorser or assignor. As between those parties, doubtless, the inquiry is legitimate ; and as between those, the decision might well be different from what it would be as between the assignee or endorsee and maker. When the case has been thus presented, the courts

have evidently been troubled with the consequences. The instrument is valid in its inception, and the maker has no defence against the payment of it. Yet, the transfer to the holder being usurious, is void, necessarily void; and by that means the maker is enabled to set up a defence, and avoid the payment of an honest and fair debt by reason of transactions between other parties with which he has nothing to do. This doctrine, carried to its extent, would produce a great deal of confusion and uncertainty in the most common commercial transactions of community. Banks who had issued post notes or drafts which had been afterwards passed at less than their face, would be able successfully to resist the collection as against such holders; and if they had been passed once at a discount, and afterwards at par, the *bona fide* holder for a full price would be unable to succeed, inasmuch as the taint in the first transfer necessarily follows and attaches to all subsequent negotiations. Other cases will readily suggest themselves to every one having any thing to do with negotiable or assignable choses in action.

Another consequence also inevitably follows from the adoption of this rule, and it is one which the counsel for the defendant has urged and insists upon, viz. that the transfer by the payee or obligee at a discount, being void, passes no title; and consequently, after receiving the money upon such transfer, he can regain the choses in action thus passed, by action of trover, and receive the amount thereof again from the maker or obligor. This consideration has been pressed upon the courts, and they have decided, in many instances, that the endorsee or assignee can recover against the maker, even though the title is acquired

through an usurious endorsement or assignment.
Such are the cases of Foltz vs. May, 1 Bag's Rep.
486 ; Johnson vs. King and Jones, 3 McCord's L.
R. 365 ; and several other cases. This is hardly
consistent with the rules of law, as applicable to usu-
rious transfers. If the transfer is void, no title pas-
ses. In the case of Parr vs. Eliason, 3 Esp. R. 210,
and 1 East, 92, an action of trover was brought for
a bill of exchange so passed. Mr. Law, afterwards
Lord Ellenborough, was counsel for the plaintiff, and
the cause was tried before Lord Kenyon, who scou-
ted the idea that such an action could be sustained.

Afterwards, Lord Ellenborough, when he came
to the bench, is supposed to have decided in the case
of Lowes vs. Mazzando, 1 Starkie, 385, in favor of
the position which he maintained in the former case
as counsel. This decision was afterwards followed
by others, and the law thus judicially settled, was
deemed so inconvenient that an act of parliament was
required and passed to meet the case. It would be
mere pedantry, and to the professional reader use-
less, to run over all the cases bearing upon this point.
In this country, the Supreme Court of New-Jersey, in
the case of Freeman vs. Butler, decided in Septem-
ber, 1339, have determined, in effect, that such a
transfer of a note is usurious and invalid ; and by
consequence it must follow, that the payer can re-
cover it back from the usurious endorser. In this
state, the court of the last resort have decided in the
case of Cram vs. Hendricks, 7 Wendell, 569, that
an endorsement of a negotiable note for a sum less
than the face, is not usurious ; and that the proviso
of the endorser by such endorsement, is only in legal
effect to pay the amount he received from the endor-

see ; and that therefore, in a suit against him, the endorsement is not usurious and void. The Supreme Court have decided in the case of Mazuzan vs. Mead, 21 Wendell, 285, that a guarantee by a payee in the transfer of a note, to pay the amount of the note, when the guarantor received upon the transfer less than the face, is not usurious; and that such guaranty shall be construed only as a promise to pay the amount of money actually received by the guarantor. On the other hand, it has been settled by the supreme court of the United State, in the case of Gailten vs. The Farmers and Mechanics' Bank of Georgetown, 1 Peter's Reports, 37, that when a note is endorsed to secure a previous usurious loan made by the endorsee to the endorser, such endorsee cannot recover upon such note against the maker, though there was no usury in the inception of the note. The case of Harnsin vs. Hamel, 5 Taunton, 780, is to the same point, and is quoted in the opinion in the above case, with approbation.

The case now before us comes down to the naked question, whether the transaction between Pratt and the complainants was a sale or a loan. This has been before considered and passed upon. In this case, the assignment and guaranty are included in one instrument. This circumstance can have no other or different effect than if they were included in different instruments, provided they were executed at the same time, and made part of the same transaction. It might, in the one case as well as the other, be urged that the assignment was one thing and an independant thing, and that the covenant of guaranty was another—that the one operated to transfer the title, and that the other was a mere per-

sonal covenant for the payment of a certain sum of money larger than that received, and was therefore usurious; but that such covenant being disconnected with the transfer, did not necessarily make the transfer usurious and void. It may be necessary at some future time to decide upon the character and effect of such a covenant, but it is not necessary here. I have nothing to do with the guarantors, as to enforcing their covenants against them in this suit. I have only to look and ascertain whether the transfer is good as a sale, or void as a security for a loan. I do so look at it, and I look at it in the light of common sense, and in the view, and to the motives with which such transactions are usually conducted; and, guided by these, I call this a sale of these mortgages, so considered and so understood by the parties at the time the transaction was made; and that therefore the transfer to the complainants was good as a sale, and vests in them a good title upon which they can recover in this suit. The objection of the defendant is therefore overruled.

We are here met with another objection, that the purchase of these mortgages was in violation of the restraining laws of this state, and therefore void.

The Revised Statutes provide (1 Vol. p. 708, sec. 3) that "no incorporated company, without being authorised by law, shall employ any part of its effects, or be in any way interested in any fund that shall be employed, for the purpose of receiving deposits, making discounts, or issuing notes, or other evidences of debt, to be loaned or put in circulation as money." Section 6, same page, provides that "no person, association of persons, or body corporate, except such bodies corporate as are expressly authorised by law,

Feb. 1841.

The Western
Reserve
Bank
v.
Potter.

shall keep any office for the purpose of receiving deposits, or discounting notes or bills, or issuing any evidences of debt to be loaned or put in circulation as money; nor shall they issue any bills, or promissory notes, or other evidences of debt, as private bankers, for the purpose of loaning them or putting them in circulation as money, unless thereto specially authorised by law."

In this case the complainants are a foreign moneyed corporation, and the proofs show that its officers came within this state and purchased the mortgage in question, with other mortgages; and in payment, drew a draft upon New-York for a part of the amount, and paid some of their own circulating notes, with an understanding that those notes should be put in circulation.

The defendant contends that these acts are in violation of the sections of the law above quoted. If this is so, the complainants cannot succeed here. The statute which gives a foreign corporation a right to sue in the courts of this state, also provides that (2 Rev. Stat. p. 373, Sec. 2) " when, by the laws of this state, any act is forbidden to be done by any corporation or by any association of individuals without express authority by law, and such act shall have been done by a foreign corporation, it shall not be authorised to maintain any action founded upon such act, or upon any liability or obligation, express or implied, arising out of, or made or enternd into, in consideration of such act." If, therefore, the act of the complainants was in violation of the restraining laws of this state, they cannot recover under the assignment, in any of the courts of this state.

The object of the restraining law was to prevent

unauthorised banking; and as to foreign corporations, it was intended to prevent their coming into this state and keeping an office for doing the business of banking, when not authorised by our laws. It had been contended, that foreign moneyed corporations, chartered by one of the states of the Union, had a right under the Constitution of the United States, to do their business of banking in this state. This idea was repudiated by the Supreme Court, in Pennington vs. Townsend, 7 Wendell, 276, and has since been more distinctly incorporated in the Revised Statutes. This law was never intended to prevent the circulation of notes of foreign corporations, in this state—that is provided for by another law adapted to that subject. The law in relation to the remedy by foreign corporations, was framed to meet a case or an exception suggested by Chancellor Kent, in The Silver Lake Bank vs. North, 4 Johns. Chan. Rep. 370. See also the notes of the revisers, Vol. 3 Rev. Stat. p. 754. The restraining laws then, it must be admitted, not only apply to corporations in our own state, as has sometimes before been suggested, but also to corporations created by other states; and if such foreign corporations violate this law, they shall not obtain the aid of any of our courts to recover any money which may be due to them, arising out of, or flowing from, any such act of violation. For their honest transactions, our courts are open to them—for such illegal transactions, our courts are closed.

The question, then, is simply whether these acts of the complainants constitute a violation of the restraining law. These complainants had heretofore discounted paper for citizens of this state—such discounting must be presumed to have been done law-

fully at their own counter, or within the state of Ohio. This paper so properly obtained, proves to be doubtful or bad. The complainants come here to secure it upon the best terms they can. This is very natural. A creditor most usually seeks a failing or insolvent debtor—the debtor very seldom looks after a creditor under such circumstances. In obtaining the security for this bad paper, the complainants enter into another transaction within this state, in which they make, within this state, a draft upon New-York, and pay out some of their own circulating notes, with an understanding that they shall be put in circulation. But though there was this understanding in relation to the notes, it by no means follows that they were to be used as circulating notes within this state. I cannot shut my eyes to the fact that Buffalo is a frontier town, and that it has a large trade with states bordering upon the lakes, (and among them, Ohio,) where it was perfectly lawful to circulate these notes. This may have been the head of circulation contemplated and intended. But even if it was otherwise, it hardly seems to me that this was a transaction intended to be prohibited by the restraining laws. The complainants kept no office in this state, in violation of the law—they issued no bills as private bankers.

In a case arising in the Supreme Court under this law before it underwent the process of revision, (The People vs. Brewster, 4 Wendell, 498,) that court have made a commentary upon the law, which would lead us to infer that a case of the kind here presented, did not come within its penalties. All the cases that have arisen, so far, seem to contemplate the " keeping an office" within the state, as neces-

.sary to constitute a violation of the law. De Groot vs. Van Duzer, 20 Wendell, 390, is a case of that character. There an office was kept by a foreign banking company within the city of New-York, and that fact constituted the ground of defence to the agreement.

Here, the case presented by the pleadings and proofs, does not seem to me to come within purview, intent, or meaning of the statute, or within the mischief that it was framed to prevent. This objection will therefore be disregarded; and that disposes of the whole case; and the complainants must have the ordinary order of reference to compute the amount due upon their mortgage.